OPINION
{¶ 1} Appellant, David M. Cameron, appeals the judgment entered by the Lake County Court of Common Pleas. The trial court sentenced Cameron to a two-year prison term for his conviction for tampering with evidence.
 {¶ 2} Patrice Daemons lived in a house in Mentor with her father and her adult sons, Joseph and Matthew Traz. This house is located at 7299 Burridge Avenue. Burridge Avenue is a residential street that intersects with Mentor Avenue. Eventually, *Page 2 
Cameron moved into the house.[1] In September 2007, Daemons and Cameron were not getting along, and Daemons was staying with her adult daughter at her house in another city. On September 7, 2006, Daemons was planning to go to the Mentor house to get some of her belongings. Joseph Traz asked Cameron to leave the house so Daemons could get her things. Cameron left the house.
 {¶ 3} Daemons arrived at the Mentor house with her daughter and her daughter's children. While Daemons was there, Cameron returned to Daemons' house in an intoxicated condition. Cameron and Daemons began arguing. Then, in the upstairs hallway, Cameron pulled out a knife in front of several people, including Daemons' nine-year-old grandson. Joseph Traz and others separated Cameron from the boy and took the boy downstairs. Next, Cameron entered Daemons' bedroom with her, and he shut and locked the bedroom door. In the bedroom, Cameron threatened Daemons with the knife. Specifically, he told her he would kill her and anyone who came between them.
 {¶ 4} After hearing Cameron threaten Daemons, Joseph Traz forcefully kicked the bedroom door. The kick startled Cameron, and Daemons was able to open the door. In the hallway, Cameron attempted to "jab" Joseph Traz with the knife, but was unsuccessful, and Joseph Traz eluded the attack. Joseph Traz escaped, ran down the stairs, and called 9-1-1.
 {¶ 5} While Joseph Traz was on the phone with authorities, Cameron left the house and ran to a neighbor's house, which is immediately southeast of Daemons' house. Cameron had a brief argument with the neighbor about Cameron wanting to *Page 3 
come in the house. Then, Cameron ran to the back of the neighbor's house. At that time, Cameron disappeared from Joseph Traz's view. Per the dispatcher's instructions, Joseph Traz stayed at Daemons' house when Cameron left.
 {¶ 6} Within minutes, Officer Mike Orf of the Mentor Police Department arrived at Daemons' house. By that time, Cameron had returned to the front yard of the house. Officer Orf placed Cameron under arrest. Officer Orf conducted a pat-down search of Cameron, which revealed no weapons. Officer Orf read Cameron the Miranda warnings. See Miranda v.Arizona (1966), 384 U.S. 436. Cameron indicated he understood the warnings.
 {¶ 7} Officer Orf interviewed some of the witnesses at Daemons' house, including Joseph Traz and Daemons. Thereafter, Officer Orf went to look for the knife behind local businesses on nearby Mentor Avenue. Officer Orf found the knife in a dumpster of a closed business at 8661 Mentor Avenue. At trial, Joseph Traz and Daemons identified this knife as the knife Cameron used to threaten them.
 {¶ 8} After finding the knife, Officer Orf again read Cameron theMiranda warnings. Then he questioned Cameron about the knife. Cameron admitted the knife was his, but he denied placing the knife in the dumpster. Cameron suggested other people put the knife in the dumpster to get back at him. Also, Cameron denied threatening anyone with the knife, but he later stated that he might have used the knife for protection.
 {¶ 9} Cameron was indicted on two counts of felonious assault, in violation of R.C. 2903.11(A)(2) and second-degree felonies; two counts of aggravated menacing, in violation of R.C. 2903.21 and first-degree misdemeanors; one count of tampering with *Page 4 
evidence, in violation of R.C. 2921.12(A)(1) and a third-degree felony; and one count of unlawful restraint, in violation of R.C. 2905.03, a third-degree misdemeanor.
 {¶ 10} Cameron pled not guilty to all of the charges, and a jury trial was held. At the beginning of trial, the state apparently dismissed the misdemeanor charges against Cameron. That portion of the proceedings is not included in the transcript filed with this court. However, the state's brief acknowledges that the charges were dismissed, and the trial court's judgment entry refers to an amended indictment.
 {¶ 11} The state presented evidence regarding the remaining charges of tampering with evidence and felonious assault. After the state's case-in-chief, Cameron moved for acquittal pursuant to Crim.R. 29. The trial court denied his motion. Cameron called Thomas Butler as a defense witness. Butler is an acquaintance of Cameron and Daemons. Butler testified that, before the incident in question, he heard Daemons say she wanted Cameron out of the house and she would do whatever it took to get him out. Butler further testified that, after the incident, Daemons said she had figured out a way to get Cameron out of the house and she was very happy about it.
 {¶ 12} The jury found Cameron not guilty of the two felonious assault charges. However, the jury found Cameron guilty on the tampering with evidence charge. The trial court imposed a two-year prison sentence on Cameron for his conviction for tampering with evidence.
 {¶ 13} Cameron raises four assignments of error. His first assignment of error is:
 {¶ 14} "The trial court prejudicially erred when it permitted the interrogating police officer to testify about what the appellant said during a custodial interrogation where the *Page 5 
appellant did not voluntarily, knowingly, and intelligently waive hisMiranda right to remain silent or his Fifth Amendment right against self-incrimination."
 {¶ 15} As the state notes, Cameron did not file a motion to suppress his oral statement to the police. Further, Cameron did not object to Officer Orf's testimony regarding the statement. Thus, he has waived all but plain error. State v. Drummond, 111 Ohio St.3d 14, 2006-Ohio-5084, at ¶ 72-73, citing State v. Childs (1968), 14 Ohio St.2d 56, paragraph three of the syllabus. Plain error exists only where the results of the trial would have been different without the error. State v. Issa (2001),93 Ohio St.3d 49, 56, citing State v. Moreland (1990), 50 Ohio St.3d 58,62.
 {¶ 16} "`In deciding whether a defendant's confession is involuntarily induced, the court should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" State v. Twyford (2002), 94 Ohio St.3d 340, 360, quoting State v. Edwards (1976), 49 Ohio St.2d 31, paragraph two of the syllabus, vacated in part on other grounds (1978), 438 U.S. 911.
 {¶ 17} The Supreme Court of Ohio has held that the above factors should also be used to determine if a suspect voluntarily waived his or her Miranda rights. Id., citing State v. Green (2000),90 Ohio St.3d 352, 366. Officer Orf testified that he gave Cameron theMiranda warnings on two occasions and that Cameron indicated he understood his Miranda rights. *Page 6 
 {¶ 18} In this matter, Cameron claims his waiver was not knowingly, intelligently, and voluntarily made because he was intoxicated. This court has previously addressed a similar issue and held:
 {¶ 19} "Appellant argues that she was unable to assert her waiver freely due to her intoxication. Intoxication, unto itself, is insufficient to render a statement per se inadmissible. See State v.Stanberry, 11th Dist. No. 2002-L-028, 2003-Ohio-5700, at ¶ 30. Rather, `* * * the presence of drugs or alcohol should be considered, (but) the amount must sufficiently impair the confessor's abilities to reason.'State v. Stewart, 11th Dist. No. 2001-P-0035, 2002-Ohio-7270, at ¶ 49. While appellant's contention that she was intoxicated was corroborated by Officer Palinkas, she was able to respond to his questions and elaborate independently on why the methamphetamine was in the cigarette package. These facts do not demonstrate that appellant's abilities to reason were so highly impaired as to render her statements inadmissible." State v. McEndree, 11th Dist. No. 2004-A-0025,2005-Ohio-6909, at ¶ 32.
 {¶ 20} In this matter, Joseph Traz stated, during the 9-1-1call, that Cameron had been drinking. Also, Officer Orf testified that Cameron was "highly intoxicated" when he was arrested. However, there was no evidence presented regarding Cameron's specific level of intoxication. The evidence presented at trial infers that Cameron was not so intoxicated as to render his waiver involuntary. Cameron complied with Officer Orf's instructions to get on the ground to be arrested. Cameron was given the Miranda warnings on two occasions. He indicated he understood the warnings. While Cameron admitted the knife was his in his statement to Officer Orf, he denied placing the knife in the dumpster. Instead, he told Officer Orf that someone in the house placed the knife in *Page 7 
the dumpster to get back at him. Cameron's statement to Officer Orf that he was "framed" suggests Cameron's ability to reason.
 {¶ 21} We cannot say the admission of Cameron's statement was plain error.
 {¶ 22} Cameron's first assignment of error is without merit.
 {¶ 23} Cameron's second assignment of error is:
 {¶ 24} "Defense counsel rendered ineffective assistance of trial counsel in violation of the defendant's federal and state constitutional rights."
 {¶ 25} In State v. Bradley, the Supreme Court of Ohio adopted the following test to determine if counsel's performance is ineffective: "[counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus, adopting the test set forth inStrickland v. Washington (1984), 466 U.S. 668.
 {¶ 26} Initially, we will address whether Cameron's trial counsel was ineffective for failing to object to the admission of Cameron's statement to Officer Orf.
 {¶ 27} "The Supreme Court of Ohio has held that trial strategy decisions should not be second-guessed and that `"a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."`" State v. Ogletree, 11th Dist. No. 2005-P-0040, 2006-Ohio-6107, at ¶ 64, quoting State v. Mason (1998),82 Ohio St.3d 144, 157-158, quoting Strickland, 466 U.S. at 689.
 {¶ 28} In this matter, Cameron's trial counsel may have intentionally allowed Cameron's statement to be heard by the jury. Such a decision would have been a trial *Page 8 
strategy decision. See State v. Adams, 11th Dist. No. 2003-T-0064,2005-Ohio-348, at ¶ 22. In State v. Adams, trial counsel intentionally permitted the defendant's recorded statements to be played for the jury. Id. Counsel's rationale for this decision was to permit the jury to hear the defendant's version of the events, without requiring the defendant to testify and be subject to cross-examination. Id.
 {¶ 29} In this matter, trial counsel may have employed a similar trial strategy. While Cameron admitted the knife was his, he denied placing the knife in the dumpster. In addition, he denied using the knife to threaten Daemons or members of her family. Trial counsel may have thought it would be beneficial for the jury to hear Cameron's denial of the crimes in question, without subjecting him to cross-examination. Since the decision to allow the statements to be admitted was arguably a trial strategy decision, we do not find that trial counsel's performance fell below a level of reasonable representation.
 {¶ 30} In addition, Cameron had not demonstrated prejudice by the admission of the statement. While he admitted ownership of the knife, both Joseph Traz and Daemons testified that the knife found in the dumpster was the knife used by Cameron on the day in question. Thus, the admission of Cameron's statement in which he acknowledges the knife was his did not affect the results of the trial regarding his conviction for tampering with evidence. Further, Cameron denied placing the knife in the dumpster.
 {¶ 31} Cameron's second assignment of error is without merit.
 {¶ 32} Cameron's third assignment of error is: *Page 9 
 {¶ 33} "The trial court prejudicially erred because its verdict was based upon insufficient evidence."
 {¶ 34} When determining whether there is sufficient evidence presented to sustain a conviction, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991),61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v.Virginia (1979), 443 U.S. 307.
 {¶ 35} Cameron was convicted of tampering with evidence, in violation of R.C. 2921.12, which provides, in part:
 {¶ 36} "(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the following:
 {¶ 37} "(1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation;
 {¶ 38} "* * *
 {¶ 39} "(B) Whoever violates this section is guilty of tampering with evidence, a felony of the third degree."
 {¶ 40} The Supreme Court of Ohio has held that "`circumstantial evidence and direct evidence inherently possess the same probative value and therefore should be subjected to the same standard of proof.'"State v. Biros (1997), 78 Ohio St.3d 426, 447, quoting State v.Jenks, 61 Ohio St.3d 259, paragraph one of the syllabus. *Page 10 
 {¶ 41} The state presented the following circumstantial evidence that Cameron placed the knife in the dumpster. The audio recording of Joseph Traz's 9-1-1 call was played for the jury. During the call, Joseph Traz stated that Cameron left Daemons' residence with a knife in his hand. Then, Joseph Traz stated that Cameron returned to Daemons' house a few minutes later, without the knife. The knife that Cameron used on the day in question was found in a nearby dumpster. Thus, the clear inference is that Cameron discarded the knife in the dumpster.
 {¶ 42} When Cameron left Daemons' residence with the knife, Joseph Traz was on the phone with the 9-1-1 dispatcher. Therefore, there was evidence that Cameron knew an official investigation was imminent. In addition, the subject of the call was Cameron's alleged use of a knife to threaten Daemons and Joseph Traz. Finally, the act of placing the knife in the dumpster was evidence of attempting to conceal the knife and eliminate its evidentiary value. The state presented sufficient evidence on the charge of tampering with evidence.
 {¶ 43} Cameron argues that it was "physically impossible" for him to have hidden the knife in the dumpster. Cameron asserts there was not enough time for him to have left the neighbor's property, run to the dumpster, placed the knife in the dumpster, and, then, returned to Daemons' residence.
 {¶ 44} First, we will address Cameron's argument regarding the amount of time that passed. Cameron contends that only 58 seconds passed between the time he was at the neighbor's house until the time he returned to Daemons' residence. This computation is derived from the audio recording of the 9-1-1 call. Cameron argues he was still on the neighbor's back porch at time index 1:47 of the call and that he returned *Page 11 
to Daemons' residence at 2:45 of the call. Actually, Joseph Traz stated that Cameron was heading towards Mentor Avenue at 1:45 of the call. Further, Joseph Traz may not have been relating the events to the dispatcher at the exact moment they were occurring. As the state notes, Joseph Traz was providing the dispatcher with general information such as his name and phone number in the time-frame immediately prior to the statement that Cameron was heading towards Mentor Avenue. Thus, it is possible that Cameron had started heading towards Mentor Avenue prior to Joseph Traz's statement, and Traz was merely updating the dispatcher.
 {¶ 45} Next, we will address the distance. Cameron argues he would have had to travel 400 feet from the neighbor's residence, to the dumpster, and back to Deamons' residence. There was no testimonial evidence presented regarding the distance between these locations at trial. However, the state presented an aerial map as an exhibit. Depending on exactly where Cameron was on the respective properties and where on the property at 8661 Mentor Avenue the dumpster was located, his computation of 400 feet may be accurate.[2] However, depending on those same variables, it could be significantly shorter.
 {¶ 46} Having noted that Cameron's figures may not be precise, we will assume they are accurate for the purpose of this analysis. There was no evidence presented regarding Cameron's foot speed. However, we believe the jury, based on its common *Page 12 
experiences, could have concluded that it was possible for Cameron, an adult male, to travel 400 feet (or 133.3 yards) in one minute.
 {¶ 47} Cameron argues that the fact he was intoxicated makes it more unlikely that he was able to complete the trip in the requisite time. There was no evidence presented regarding the effect of Cameron's intoxication on his speed. Therefore, the fact that he was intoxicated does not make it "physically impossible" for him to complete the trip in the allotted time.
 {¶ 48} Since the state presented sufficient evidence to sustain a conviction on the tampering with evidence charge, the trial court did not err by denying Cameron's Crim.R. 29 motion for acquittal.
 {¶ 49} Cameron's third assignment of error is without merit.
 {¶ 50} Cameron's fourth assignment of error is:
 {¶ 51} "The trial court prejudicially erred because its verdict went against the manifest weight of evidence."
 {¶ 52} In determining whether a verdict is against the manifest weight of the evidence, the Supreme Court of Ohio has adopted the following language as a guide:
 {¶ 53} "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387. (Citations omitted.) *Page 13 
 {¶ 54} The weight to be given to the evidence and the credibility of witnesses are primarily matters for the jury to decide. State v.DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 55} Cameron reiterates his arguments from his sufficiency assignment of error that it was physically impossible for him to have placed the knife in the dumpster. Due to our analysis of Cameron's third assignment of error, we reject his impossibility argument.
 {¶ 56} Cameron claims someone else must have placed the knife in the dumpster. In his brief, he suggests the neighbor could have placed the knife in the dumpster. However, at trial, there was evidence presented that Cameron was arguing with the neighbor because the neighbor did not let Cameron into the neighbor's house. It seems unlikely that the same neighbor would then attempt to help Cameron by disposing of the knife. In his statement to the police, Cameron suggests that someone at Daemons' house placed the knife in the dumpster to get back at him. However, there was no evidence presented that anyone other than Cameron left Daemons' residence between the time of the incident and the time the knife was found.
 {¶ 57} Daemons' credibility was attacked by Butcher, who testified as a defense witness. His testimony suggested that Daemons may have fabricated the story to force Cameron to move out of the residence. Even accepting Butcher's testimony as true, the fact that Daemons was happy about Cameron being out of the house does not equate to her fabricating the story about Cameron's threats with the knife. She may have just been happy with the end result. *Page 14 
 {¶ 58} Cameron's objections primarily concern factual determinations made by the jury. In regard to the tampering with evidence conviction, the jury resolved many of those factual matters in favor of the state. However, we note that the jury found Cameron not guilty of the felonious assault charges. This demonstrates the jury's ability to be impartial and, if they were not convinced by the state's evidence, to enter a not guilty verdict.
 {¶ 59} After reviewing the evidence, we cannot conclude that the jury lost its way or created a manifest miscarriage of justice.
 {¶ 60} Cameron's fourth assignment of error is without merit.
 {¶ 61} The judgment of the trial court is affirmed.
CYNTHIA WESTCOTT RICE, P.J., MARY JANE TRAPP, J., concur.
[1] While different people lived at 7299 Burridge Avenue at different times, we will refer to this residence as Daemons' house for the purposes of this opinion.
[2] In his reply brief, Cameron changes his computation from 400 feet to 600 feet. Cameron now claims he would have had to take a different route to the dumpster and back. Our independent review of the aerial map indicates Cameron's initial computation of 400 feet was probably more accurate. It should be noted that no specific distances were presented to the jury. The jury was only presented with the aerial map. Based on that evidence, we believe the jury was free to conclude that it was possible for Cameron to travel from the neighbor's property, to the dumpster, to Deamons' house within one minute. *Page 1